**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | |
|---|---|
| **KEVIN THOMPSON**, *individually and on behalf of all others similarly situated,*<br><br>*Plaintiff,*<br><br>v.<br><br>**ACADIA HEALTHCARE COMPANY, INC.**<br><br>*Defendant.* | Case No.:<br><br>**COMPLAINT-CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Kevin Thompson ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class-action complaint against Acadia Healthcare Company, Inc. ("Acadia" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. In support thereof, Plaintiff alleges as follows:

## INTRODUCTION

1. This class-action suit arises out of a cybersecurity attack (the "Data Breach") that was recently perpetrated against Defendant, who held in its possession certain personally identifiable information ("PII" or "Private Information") belonging to Plaintiff and the putative Class and Subclass. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class and Subclass' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class and Subclass that their information was subjected to unauthorized access by a ransomware group and precisely what type of information was accessed. Accordingly, Plaintiff

brings this action against Defendant, asserting claims for negligence and breach of implied contract.

## BACKGROUND ON DATA BREACHES

### I. Why Data Breaches Happen

2. Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. The PII of individuals is of high value to criminals, as evidenced by the prices they will pay through the dark web.

3. Numerous sources cite dark web pricing for stolen identity credentials.[1] For example, Personal Information can be sold at a price ranging from $40 to $200.[2] Criminals can also purchase access to the entire contents of a company's stolen data for $900 to $4,500.[3]

4. Once an individual's Private Information is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised data to gather and steal even more information.[4]

5. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone/utility fraud, and bank/finance fraud.

6. Cybercriminals frequently cross-reference multiple sources of PII to marry unregulated data available elsewhere with criminally stolen data to assemble complete dossiers on individuals.

---

[1] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[2] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[3] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[4] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited February 11, 2026).

7. The development of full packages means that the stolen PII can easily be used to link and identify it to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a full package and sell it at a higher price to unscrupulous operators and criminals (such as scam telemarketers) over and over.

## II. Dangers to Victims

8. There are many dangers that potentially affect victims of identity theft, including increased spam telephone calls and emails; damaged credit; loss of employment; loss of healthcare benefits; loss of access to email and other accounts; loss of housing; and crimes being committed in the victim's name.

9. The Identity Theft Resource Center's 2021 Consumer Aftermath Report documents serious financial and emotional consequences among surveyed identity-crime victims. 29% of surveyed victims had previously experienced another identity crime, and 10% of pre-pandemic respondents reported suicidal feelings, the highest level recorded by the ITRC since 2003. Among respondents affected by pandemic-related identity fraud, 33% lacked sufficient money for food or utilities, 14% were evicted for nonpayment of rent or mortgage, and 54% felt violated because their identities had been misused.[5]

10. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

[5] Identity Theft Resource Center, 2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends, and Workplaces (May 2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited July 30, 2026).

increases."[6] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[7]

11. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[8] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[9]

12. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

13. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

14. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit

---

[6] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[7] *Id.*
[8] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[9] *See* https://www.investopedia.com/terms/s/ssn.asp

bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[10]

15. Theft of PII is also an issue outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII has become valuable property.

16. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[11]

17. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[12]

18. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[13]

19. However, when consumers' Private Information is made more readily available, its market value is damaged and diminished. When such data is compromised in a data breach, this transfer of value occurs without any consideration paid to the victim for their property, resulting in an economic loss.

---

[10] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited February 11, 2026).

[11] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited February 11, 2026).

[12] https://datacoup.com/ (last visited February 11, 2026).

[13] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited February 11, 2026).

## III. Prevalence and Prevention

20. In 2025, a new all-time high for data compromises occurred, with 3,322 compromises reported.[14] Of the 2025 recorded data breaches, 478 of them, or approximately 14% (478 of 3,322), were in the professional services industry.[15] The 478 breaches reported in 2025 exposed nearly 12 million sensitive records. This is up from 2024 in which there were a reported 344 breaches that exposed approximately 8 million sensitive records.[16]

21. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[17]

22. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

23. As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[18]

24. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

25. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines

---

[14] *See* Identity Theft Resource Center, *2025 Annual Data Breach Report* (January 29, 2026), *available at* https://www.idtheftcenter.org/publication/2025-data-breach-report/ (last visited August 11, 2026).
[15] *Id.*
[16] *Id.*
[17] IBM, *Cost of a Data Breach 2022: A Million-Dollar Race to Detect and Respond*," https://www.ibm.com/reports/data-breach (last visited February 11, 2026).
[18] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[19] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

26. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

27. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action in

---

[19] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited February 11, 2026).

[20] *Id*.

which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the Class, and at least one member of the Class is a citizen of a State different from Defendant, including Plaintiff.

29. This Court has personal jurisdiction over Defendant because Defendant regularly conducts and solicits business in the Commonwealth of Pennsylvania and Defendant has purposefully availed itself of the privileges of conducting business activities within Pennsylvania, and the wrongful conduct giving rise to this action occurred in substantial part within this District.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this District a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

31. Plaintiff Kevin Thompson is an individual residing in Carnegie, Pennsylvania.

32. Defendant is a Delaware corporation with its principal place of business at 4020 Aspen Grove Drive Suite 900 Franklin, Tennessee 37067.

**FACTUAL ALLEGATIONS**

33. Defendant is a national healthcare network that provides behavioral healthcare services, with 279 locations across 40 states.

34. Plaintiff is and at all times relevant hereto was a patient of Defendant through the Department of Veteran's Affairs.

35. In the ordinary course of Defendant's business, Defendant gathered and maintained Plaintiff's Private Information in its computer systems.

36. Defendant agreed to and undertook legal duties to maintain the protected personal information entrusted to it safely, confidentially, and in compliance with all applicable laws.

37. Unfortunately, Defendant failed to take adequate measures to protect the Private Information of individuals like Plaintiff, including failing to implement reasonable cybersecurity safeguards or policies to protect Private Information, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems. Defendant's failures include, but are not limited to:

a. Failing to properly monitor its own data security systems for existing intrusions;

b. Failing to store files containing sensitive data in an encrypted state;

c. Failing to train employees in the proper handling of emails containing malicious software, and to maintain adequate email security practices;

d. Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

e. Failing to comply with FTC guidelines for cybersecurity; and

f. Failing to adhere to industry standards for cybersecurity.

38. As a direct and proximate result of Defendant's failures, sometime between March 21 and March 25 of 2026, Defendant suffered a cybersecurity incident (the "Data Breach") wherein cybercriminals gained access to its computer systems.

39. Through the Data Breach, the cybercriminals were able to access Plaintiff's Private Information, including his full name, address, date of birth, and private health information including but not limited to diagnoses, lab results, medications, treatment information, health insurance information, provider names, dates of service, and other highly sensitive data. *See* Exhibit A, September 30, 2026 data breach notice.

40. On or about September 30, 2026, Defendant mailed Plaintiff a letter advising him of that Data Breach. *Id.*

41. Omitted from the notice were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.

42. To date, these omitted details have not been explained or clarified to Plaintiff, who retains a vested interest in ensuring that his Private Information remains protected.

43. Based on the nature of the cyberattack, Plaintiff's Private Information has been exposed to unauthorized third parties and may be retained, combined with other data, sold, or utilized for fraudulent and criminal purposes.

44. To date, Defendant has done little to provide Plaintiff with relief for the damages he has suffered because of the Data Breach, including, but not limited to, emotional distress, the lost value of his personal data and the costs and loss of time he incurred because of the Data Breach.

45. Moreover, Plaintiff has experienced an increase in robocalls and telemarketing as a direct and proximate result of the Data Breach.

46. Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur, and should have strengthened its data systems accordingly.

47. As a direct and proximate result of Defendant's conduct, Plaintiff has been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

48. As a direct and proximate result of Defendant's conduct, Plaintiff has been forced to expend time dealing with the effects of the Data Breach.

49. Plaintiff also suffered a loss of value of his Private Information when it was acquired by cyber thieves in the Data Breach.

50. Plaintiff has incurred out-of-pocket costs for protective measures such as credit monitoring fees, and similar costs directly or indirectly related to the Data Breach.

## CLASS-ACTION ALLEGATIONS

51. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

52. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

53. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Data Breach Class:** All individuals who reside in the United States whose Private Information was accessed and/or acquired in the cybersecurity incident experienced by Defendant between March 21 and March 25 of 2026, and which is the subject of the notice that Defendant sent to Plaintiff, the Class and the Subclass on or around September 30, 2026.
>
> **Pennsylvania Data Breach Subclass:** All Pennsylvania residents whose Private Information was accessed and/or acquired in the cybersecurity incident experienced by Defendant between March 21 and March 25 of 2026, and which is the subject of the notice that Defendant sent to Plaintiff, the Class and the Subclass on or around September 30, 2026.

54. Excluded from the Class and Subclass are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

55. The Members of the Class and Subclass are so numerous that joinder of all of them is impracticable. The exact number and identities of Class and Subclass are unknown to Plaintiff at this time, as such information is in the sole possession of Defendant and ascertainable through its records.

56. There are questions of law and fact common to the Class and Subclass, which predominate over any questions affecting only individual Class and SubClass and Subclass. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class and Subclass' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class and Subclass to safeguard their Private Information;

f. Whether Defendant breached its duty to Class and Subclass to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiff, the Class and the Subclass suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant failed to provide notice of the Data Breach promptly; and

k. Whether Plaintiff, the Class and the Subclass are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

57. Plaintiff's claims are typical of those of other Class and SubClass and Subclass because Plaintiff's Private Information, like that of every other Class and Subclass member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class and Subclass because, among other things, all Class and SubClass and Subclass were injured through

the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class and SubClass and Subclass, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class and SubClass and Subclass arise from the same operative facts and are based on the same legal theories.

58. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

59. Defendant has engaged in a common course of conduct toward Plaintiff, the Class and the Subclass, in that all Plaintiff, the Class and the Subclass's data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class and Subclass set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

60. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class and Subclass would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class and Subclass would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

61. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

62. Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant failed to timely notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff, the Class and the Subclass to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

63. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class and Subclass' names and addresses affected by the Data Breach. Class and Subclass have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## FIRST COUNT
## NEGLIGENCE

64. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

65. Plaintiff brings this count individually and on behalf of all others similarly situated.

66. Defendant required Plaintiff, the Class and the Subclass to submit non-public personal information to obtain goods and services from Defendant and do business with them.

67. By collecting and storing this data in its computer systems and using it for commercial gain, Defendant had a duty of care to use reasonable means to prevent unauthorized disclosure of the information and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious time and to give prompt notice to those affected in the case of a Data Breach.

68. Defendant owed a duty of care to Plaintiff, the Class and the Subclass to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

69. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff, the Class and the Subclass and Subclass, because Defendant obtained and undertook to safeguard Plaintiff's and the Class's confidential Private Information in the course of providing medical services to its clients.

70. Independently, Defendant owed Plaintiff, the Class and the Subclass a duty of care because Defendant voluntarily undertook custody of their Private Information, knew or should have known that Plaintiff, would be harmed if that undertaking were performed negligently, and knew that Plaintiff, the Class and the Subclass had no opportunity to protect their own interests because they had no direct relationship with Defendant and no knowledge that Defendant possessed their Private Information at all. Having assumed custody of that information, Defendant

was obligated to exercise reasonable care in safeguarding it regardless of the absence of any direct transaction between Defendant and Plaintiff or Class and Subclass.

71. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

72. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

73. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class and Subclass' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class and Subclass' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class and Subclass' Private Information;

e. Failing to detect timely that Class and Subclass' Private Information had been compromised; and

f. Failing to timely notify Class and Subclass about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

74. It was foreseeable that Defendant's failure to use reasonable measures to protect Class and Subclass' Private Information would result in injury to Class and Subclass. Further, the

breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

75. It was therefore foreseeable that the failure to adequately safeguard Class and Subclass' Private Information would result in one or more types of injuries to Class and Subclass.

76. Defendant's failure to comply with the statutory and regulatory duties alleged above was not merely a general lapse in an abstract duty of care—it was a direct and proximate cause of the Data Breach itself. Had Defendant satisfied those duties, the vulnerability exploited to access Defendant's systems would have been identified and remediated before the Data Breach occurred. Defendant's statutory and regulatory violations are accordingly the proximate cause of the Data Breach that produced Plaintiff's and Class and Subclass' injuries, not merely background context for them.

77. Plaintiff, the Class and the Subclass are entitled to compensatory and consequential damages suffered because of the Data Breach, including damages associated with the completed loss of privacy, confidentiality, and control over their Private Information.

78. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff, the Class and the Subclass in an unsafe and unsecure manner.

79. Plaintiff, the Class and the Subclass are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class and Subclass.

## SECOND COUNT
## BREACH OF IMPLIED CONTRACT

80. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

81. Plaintiff brings this count individually and on behalf of all others similarly situated.

82. When Plaintiff, the Class and the Subclass and Subclass' Private Information was provided to Defendant in connection with Defendant's provision of medical services, Defendant entered implied contracts with Plaintiff, the Class and the Subclass under which Defendant agreed to reasonably protect such information.

83. Defendant solicited and obtained Class and Subclass' Private Information as part of Defendant's regular business practices.

84. In entering such implied contracts, Plaintiff, the Class and the Subclass reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including the Federal Trade Commission Act, and adhered to industry standards.

85. Plaintiff, the Class and the Subclass conferred value on Defendant by way of their Private Information, with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

86. Plaintiff, the Class and the Subclass would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

87. Plaintiff, the Class and the Subclass would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

88. Plaintiff, the Class and the Subclass fully and adequately performed their obligations under the implied contracts with Defendant.

89. Defendant breached its implied contracts with Class and Subclass by failing to safeguard and protect their Private Information.

90. As a direct and proximate result of Defendant's breach of the implied contracts, Class and Subclass sustained damages as alleged here, including the loss of the benefit of the bargain.

91. Plaintiff, the Class and the Subclass are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach. Those damages include the failure to receive the confidentiality and data security that formed part of the parties' exchange.

92. Plaintiff, the Class and the Subclass are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class and Subclass.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class described above seeks the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class and Subclass' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff, the Class and the Subclass;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff, the Class and the Subclass;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

DATED: October 9, 2026

Respectfully submitted,

KIMMEL & SILVERMAN, P.C.

*/s/ Jacob U. Ginsburg*
Jacob U. Ginsburg, Esq.
30 E. Butler Ave.
Ambler, PA 19002
Direct Dial: (267) 468-5374
jginsburg@creditlaw.com
teamkimmel@creditlaw.com
*Counsel for Plaintiff and the Proposed Class*